## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| _____ )<br>TAHIR AZIM QURESHI  )<br>2541 Glenallan Avenue, Apt. # 201  )<br>Silver Spring, MD 20906  )<br> )<br> Plaintiff,  )<br> )<br> v.  )<br> )<br>Civil Action No. 1:18-cv-00901  )<br>COLLABRALINK TECHNOLOGIES, INC.  )<br>C/o MR. RAHUL PANDHI, (Registered Agent)  )<br>8403 Greensboro Drive, Suite 1020  )<br>McLean, VA 22102-5109  )<br> )<br> Defendant.  )<br>_____) | Civil Action No._____ |

## COMPLAINT

Plaintiff, Tahir ZIM. Qureshi ("Mr. Qureshi" or "Plaintiff"), by and through his

undersigned Counsel, files this Complaint of discrimination, against Collabralink Technologies

Inc. ("CTI" or "Defendant"), based on Race, Sex/Gender, Religion, National Origin, and

Retaliation, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S. Code

§ 2000e et seq., and Section 1981 of the Civil Rights Act of 1866 (Section 1981), 42 U.S. Code §

1981.

## INTRODUCTION

1.     Plaintiff, brings this action seeking declaratory, injunctive, and monetary relief against

Defendant CTI, for its unlawful and intentional discrimination, against Mr. Qureshi, in violation

of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S. Code § 2000e et seq., and 42

U.S. Code § 1981. Mr. Qureshi claims that CTI discriminated against him, harassed and created a hostile work environment for him, on the basis of his race, sex/gender, religion, and national origin, when his supervisor Ms. Eleanor Luu ("Ms. Luu"), CTI's Accounting Manager, yelled and shouted at him, bullied him, intentionally made false statements against him, intimidated and humiliated him, harassed him and treated him in a hostile manner that was different from the way she addressed or treated his coworkers who were all female Vietnamese-Americans as Ms. Luu herself, and who are Buddhists; when on his very first day at work, Ms. Luu asked to know Mr. Qureshi's country of origin, and later his religion, even though she knew he was a United States citizen and a resident of Maryland; and when with animus, she retaliated against him, after he complained to Ms. Luu's supervisor Ms. Zornitsa Yardanov ("Ms. Yardanov"), about Ms. Luu's hostility, in targeting him, harassment, yelling/bullying, intimidation, and discriminatory treatment of him, by orchestrating and intentionally making false and hostile series of unfounded accusations against, Mr. Qureshi, in order to injure his employment interests, that ultimately led to the termination of his employment with Defendant.

2.      Mr. Qureshi is an Arab-Pakistani American Muslim male. On August 2, 2019, he began his employment with CTI as an Account Receivable Staff Accountant. CTI was his employer. He was hired on an annual salary of $83,000 (Eighty-three thousand dollars), and was to work for eight (8) hours per work day, forty (40) hours per week.

3.      After he accepted the offer of employment from CTI, several of CTI's management personnel, sent him congratulatory welcome emails, and expressed giddy interest about his hiring, and telling him how "excited" they were that he was coming onboard to work for CTI. Notably, the only person who did not send Mr. Qureshi a congratulatory note, and who did not show any interest at all in him being hired, was his direct supervisor to be, Ms. Eleanor Luu.

4.      Mr. Qureshi worked for CTI only for few days short of a month, when he was discriminatorily terminated on August 29, 2019. This termination date is also significant because it meant that Mr. Qureshi's right to receive health care insurance benefit and other benefits as a full-time employee, will not vest, because he was terminated three (3) days before his right to receive such benefits vests on September 1, 2019, according to CTI's employment policy. Defendant intentionally, wrongfully, and unscrupulously terminated Mr. Qureshi at the time it did, to avoid giving him any health insurance benefits or other benefits, that he would have been entitled to beginning September 1, 2019, or the ability to claim those. CTI calculatedly terminated him few days before his right to have those benefits, vested.

5.      With his educational background and experience, Mr. Qureshi was more than qualified for the position of Account Receivable Staff Accountant. He had significant previous billing work experience prior to coming to CTI. Mr. Qureshi's educational background, qualifications and experience are impressive, and directly relevant to the job he applied for and was hired to do at CTI.

6.      Mr. Qureshi holds a BS in Finance, and BS in General Business and Management, from the University of Maryland, College Park, MD. He also completed a Certified Public Accountant ("CPA") course requirements, at the University of Maryland, College Park, MD, but has not passed the CPA exam yet. Mr. Qureshi is also conversant with the following software: Deltek Costpoint, Deltek GCS Premier, Deltek, Vision, Deltek Time & Expense, Cognos Reports, Microsoft Excel, Microsoft Word, Outlook and Adobe Acrobat.

7.      Defendant knew that Mr. Qureshi was more than qualified for the position, when it hired him. CTI was aware of Mr. Qureshi's qualification and experience, as they were detailed in his resume that he provided its hiring personnel during the application and hire process. Mr. Qureshi

believes that he is more qualified to do the job, than all of his coworkers at CTI's accounting department, including his supervisor Ms. Luu.

8.     With his previous knowledge and experience in billing, Mr. Qureshi was able to hit the ground running on his first work day at CTI. And during that brief one month tenure, he was effective, because he performed his job professionally, and superbly well. He also produced immediate positive results, including revising a $2,000,000 (Two Million Dollars), invoice that was prepared by others before he was hired, that one of CTI's client/customer rejected and asked to be redone. The invoice revision job was a big task that took Mr. Qureshi all day - eight (8) hours to complete, but he successfully got it done.

9.     Mr. Qureshi was instrumental in getting the IT department to do something about repairing or replacing an old and continuously malfunctioning printer that hampered the work of the accounting department before, and after he was hired, and which no one did anything effective about, other than a constant lamenting of frustration about how the bad printer was impacting their ability to do their work, until Mr. Qureshi arrived and successfully dealt with the issue.

10.     When he started work at CTI, after experiencing the same printer malfunction that was impacting everyone's and now, his own ability to complete his work, Mr. Qureshi took the initiative to firmly speak directly to the IT department and demanding they do something about the printer. After his discussion with the IT people, a new printer was soon brought in, that solved the printer issue, and he and his coworkers at the account department, were able to do their printing tasks, without hassle. Mr. Qureshi is a goal-oriented worker, and a problem solver.

11.     As a result of CTI and his management's discrimination, harassment, hostility, intimidation humiliation, retaliation, and intentional and wrongful termination of his

employment, Mr. Qureshi suffered emotional distress, sleep deprivation/insomnia and anxiety, for which he received medical treatment and was put on prescribed medications of Alprazolam 0.5 mg, and Sertraline HCI 100 mg on or about September 16, 2019, to deal with his anxiety and insomnia. Mr. Qureshi was not on any anxiety or insomnia medication before his hire by CTI or during the period he was employed by it.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.     Mr. Qureshi exhausted his Administrative Remedies before bring this suit. On March 31, 2020, Mr. Qureshi filed his Charge of Discrimination (Form 5) with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of the protected categories of: race, sex/gender, religion, national origin and retaliation. On August 31, 2020, the EEOC issued Mr. Qureshi a Notice of Suit Rights letter (Form 161), which was mailed on September 1, 2020, and received by Mr. Qureshi's counsel on his behalf, on September 4, 2020, and hence, this timely action. See attached **Exhibit A**.

## JURISDICTION AND VENUE

13.     This Court has federal question jurisdiction over Plaintiff's discrimination claims under 28 U.S.C. § 1331.

14.     Venue is proper in the United States District Court, District of Virginia, Eastern Division in Alexandria Virginia, under 28 U.S.C. § 1391. Plaintiff's claims arose, in Virginia, where he worked as an Account Receivable Staff Accountant as an employee of the Defendant CTI, and where the adverse actions taken against Plaintiff that gave rise to this law suit occurred.

## PARTIES

**Plaintiff:**

15.     Mr. Qureshi is an Asian-Pakistani American male, of Pakistani origin and a Muslim. He is a citizen of the United States, and a resident of the State of Maryland. Mr. Qureshi was employed by CTI from August 2, 2019, as an Account Receivable Staff Accountant, until August 29, 2019 (barely a month after his hire), when he was discriminatorily and unlawfully terminated.

 **Defendant:**

16.     Defendant CollabraLink Technologies Inc., is an Illinois Stock Corporation, with its Registered Office Address at 8405 Greensboro Drive, Suite 1020, McClean, VA, 22102-5109, that does and conducts business in the United States, and in the Commonwealth of Virginia.

## STATEMENT OF FACTS

17.     On July 31, 2019, Mr. Qureshi was offered employment by Defendant, as a Full-time Account Receivable Staff Accountant, and he accepted that offer on the same date. His work week was eight (8) hours per day, and forty (40) hours per week. He was hired at an Annual Salary of $83,000 (Eighty-three thousand dollars). Mr. Qureshi's starting date was August 2, 2019, and he was to report directly to Ms. Luu, as his direct supervisor.

18.     On August 29, 2019, Mr. Qureshi was terminated. The termination letter the Defendant gave Mr. Qureshi, did not state any reason for his termination. Mr. Qureshi was treated differently and terminated because of his race, sex, religion, and national origin. He was also retaliated against, because he complained about Ms. Eleanor Luu's harassment/hostility towards him, bullying, shouting at him, intimidating and humiliating him. In his August 26, 2019 rebuttal memo to all Ms. Luu said against him in her August 21, 2019, memo, Mr. Qureshi among other

things, demanded that Ms. Eleanor Luu apologize to him for all the false accusations she made against him. But Mr. Qureshi never received any apology from Ms. Luu or the Defendant. Instead, CTI terminated his employment on August 29, 2019.

19.     Ms. Kim, and Ms. Hanh, are Mr. Qureshi's coworkers. They are in the same situation as him, because they do the same job as Mr. Qureshi, and they all work under Ms. Eleanor Luu the Accounting Manager, in CTI's accounting department. Kim and Hanh and Eleanor Luu, are all Vietnamese, and are all female. Ms. Luu speaks to Kim and Hanh most of the time in their Vietnamese language, which Mr. Qureshi does not understand, and which he finds unacceptable because it distracted and impacted his ability to concentrate on his work while they were chatting in their Vietnamese language with varied high pitches.

20.     Kim and Hanh and Eleanor Luu, were already employed and working at CTI before Mr. Qureshi was hired, and Eleanor treated them better than him. She was not hostile to them, did not shout at them, or try to intimidate them, as she did to Mr. Qureshi, almost as soon as he started working at CTI. It was clear to Mr. Qureshi from the beginning that Ms. Luu did not like working with him because he was a man, and because of his race, sex/gender, religion, and national origin. Ms. Luu did not want Mr. Qureshi there and immediately did all she could to remove him, and she ultimately succeeded.

21.     On his first day, Mr. Qureshi arrived at work on the morning of Friday, August 2, 2019, before 8:00 a.m., and before any other accounting employee arrived. He had been told by CTI's recruiter, Ms. Allison Harllee, that Ms. Luu wanted him to be at work at 8:00 a.m.

22.     After introducing him to some of the workers, Ms. Luu took Mr. Qureshi alone into the kitchen and out of no context, Ms. Luu asked Mr. Qureshi to tell her what country he was from -

i.e., his national origin. Mr. Qureshi told her that he was from Pakistan, and that he was brought to the United States, when he was 13 years old.

23.    Ms. Luu's questioning about Mr. Qureshi's country of origin unnerved and concerned him, because of the circumstances of the questioning - taking him aside into the kitchen alone, the out of the blues point blank way she asked him the question without any prior discussion leading to that, and the fact that it was his first day at work. Mr. Qureshi wondered why knowing his country of origin was of such primary importance to Ms. Luu, even as she was hurrying off for her vacation.

24.    When Ms. Luu asked Mr. Qureshi his country of origin, and he informed her that he was born in Pakistan, it was also clear then to Ms. Luu, that Mr. Qureshi was also a Muslim. However, Ms. Luu wanted to be sure, because Ms. Luu later asked Mr. Qureshi about his religion, and Mr. Qureshi told her that he is a Muslim. That also unnerved and worried Mr. Qureshi, as he wondered what his religion had to do with his ability to do the accounting job that he was hired for.

25.    CTI is owned by an Indian-American. One of the employees, Amjid, told Mr. Qureshi on August 7, 2019, that he (Qureshi), looked like Mr. Yash Pandhi the owner and the Chairman of CTI. Ms. Luu at the time, had prior knowledge that her bosses, Mr. Yash Pandhi (owner and the Chairman of CTI), and his son, Mr. Rahul Pandhi (the CEO of CTI), are both Indians and Hindus.

26.    Mr. Qureshi believes that after Ms. Luu found out that he was a Pakistani and a Muslim, she passed that information to Mr. Yash Pandhi and his son, Mr. Rahul Pandhi.

27.     Mr. Qureshi believes that the tacit support of both Pandhis – owner/Chairman (father) and CEO (son) respectively, emboldened Ms. Luu to discriminate against him based on his national origin and religion.

28.     In his memorandum dated August 26, 2019, three days before he was terminated, Mr. Qureshi complained to Ms. Eleanor Luu's supervisor, and CTI's Controller, Ms. Yordanov, about Ms. Luu asking him what his national origin and religion was. Mr. Qureshi also told Ms. Yordanov, that Ms. Luu's question about his national origin and religion was disturbing to him, and that it made him very uncomfortable, because none of that had anything to do with his ability to do his accounting job.

29.     Mr. Qureshi believes that if he were Indian-American, and a Hindu, or Vietnamese-American and Budhist, Ms. Luu would not have asked about his national origin and religion or treated him differently, because she (Ms. Luu) and the rest of his coworkers were Vietnamese, and Budhists, and the owner of the company and his son CEO, are Indian-Americans, and Hindus.

30.     Mr. Qureshi also believes that his termination few days later, was retaliatory, because he complained about Ms. Luu asking him about his country of origin and religion in his August 26, 2019 memo, and had complained earlier in his memo dated August 19, 2019, about Ms. Luu's discriminatory treatment, harassment and hostility by shouting, yelling, bullying, intimidating and humiliating him.

31.     Ms. Luu's discriminatory treatment and hostility against Mr. Qureshi started soon after his hire. The way she treated Mr. Qureshi once he was hired, confirmed to him that she was not in favor of him being hired, because she did not waste time in targeting, singling him out, and micro-managing him. Also, her continuous hostility towards him for no good reason, culminated

in Mr. Qureshi's termination, which Ms. Luu generated and orchestrated in less than a month of his starting work at CTI.

32.     Mr. Qureshi believes also, that the owner/Chairman and CEO duo, tacitly supported Ms. Luu's retaliatory write up against him, and authorized or sanctioned his ultimate termination without any investigation of his complaint against Ms. Luu, or reprimand of her, for her harassment and hostile way she treated Mr. Qureshi.

33.     When Ms. Luu asked Mr. Qureshi about his country of origin, she knew or should have known that where Mr. Qureshi came from, or his country of origin, or his religion, has no relevance to, or bearing on his ability to do the Account Receivable Staff Accountant job that CTI hired him to do, because Mr. Qureshi was qualified and able to do the job, and had been deemed so qualified by CTI, when it interviewed and hired him thereafter.

34.     Ms. Luu did not tell Mr. Qureshi the purpose of her question, never gave or explain to him, her reason for asking Mr. Qureshi about where he came from, on the very first day he started work at CTI, when she already knew that Mr. Qureshi was a citizen of the United States, and a resident of the State of Maryland.

35.     Ms. Luu did not explain to Mr. Qureshi, why knowledge of his national origin, was Ms. Luu's first order of business with him, on his first day at work, or why it should be part of a proper and necessary orientation, that is a universal business practice, usually given to newly hired employees, to help acquaint them with what their new company does, is about, etc., their new workplace, and their new coworkers.

36.     CTI is owned by an Indian-American. One of the employees, Amjid, told Mr. Qureshi on August 7, 2019, that he (Qureshi), looked like Mr. Yash Pandhi the owner and the Chairman of CTI. It is public international knowledge, that Indians, who are majority Hindus, historically hate

Pakistani's who are Muslims, like Mr. Qureshi, with unmitigated passion, and most likely would not knowingly or intentionally hire a Pakistani Muslim, or retain such in their company after knowledge that he is a Pakistani Muslim.

37.     Before Ms. Luu asked Mr. Qureshi where he came from, she could not tell from his name whether he was Indian American or Pakistani-American, because people in both countries use the names "Tahir", and "Qureshi," and some people mistake him for an Indian-American.

38.     Ms. Luu's out of the blue, point blank question to Mr. Qureshi about his country of origin, betrayed her heightened and sinister interest in his national origin. It shows also that it was a question that has long been on her mind, and one she had wanted to ask Mr. Qureshi during his interview, but could not, and did not ask, because her boss Ms. Yardanov was present.

39.     No one knew exactly what Mr. Qureshi's national origin was, before he was hired. On his first day at work, Mr. Qureshi gave his United States passport to Ms. Laura Keegan ("Ms. Keegan") in CTI's HR office, as he was required to, and which she made a copy of, before Ms. Luu's questioned Mr. Quereshi about his national origin and religion.

40.     Ms. Keegan was the first person to know Mr. Qureshi's national origin on his first day at CTI, because his passport states his birthplace as Pakistan. However, no one at HR including Ms. Keegan, shared any details from Mr. Qureshi's passport with Ms. Luu prior to Ms. Luu asking Mr. Qureshi, and before he told her that he came from Pakistan.

41.     Mr. Qureshi believes that if he was Indian-American, or Vietnamese-American, he would not have been treated differently or terminated as he was. If Mr. Qureshi was Indian-American like the chairman and the CEO, Ms. Luu would not have harassed and treated him in a hostile manner, but she did, because she did not have to worry about the reactions of the owners.

42.     Ms. Luu asking Mr. Qureshi, a new employee after he has just been hired, is discriminatory, because she certainly did not ask Mr. Qureshi's Vietnamese coworkers, their country of origin or their religion. Mr. Qureshi found that to be intimidating, and it telegraphed to him that his national origin and religion was an issue for Ms. Luu and CTI, which his swift termination seems to confirm.

43.     During his interview process, Ms. Harllee CTI's HR recruiter, mentioned to Mr. Qureshi over the phone, that the accounting department employees that he was going to be working with, are a "tightknit group." At the time, Mr. Qureshi did not know that Ms. Luu the Accounting Manager, Ms. Hanh Dinh the Accounts Payable Accountant, and Ms. Kim Dang the Payroll Accountant, were all Vietnamese-Americans – in short, that all the accounting staff are all Vietnamese-Americans, or that all of them were female. When he started work, Mr. Qureshi also got to know, that he was hired to replace another female, who left the position he occupied, who he was told resigned to pursue other interests.

44.     The employee Mr. Qureshi was hired to replace was an African-American female. When Mr. Qureshi was hired, the whole accounting staff was all female except the CFO, who is Indian-American and the son of the owner. And as soon as he started, it was clear to him what Ms. Harllee meant when she told him, that the accounting personnel at CTI, was "tight-knit group." It also became clear to Mr. Qureshi, that because he was not Vietnamese-American, it will be difficult if not impossible for him to be accepted as a member of that "tight-knit group."

45.     During Ms. Qureshi's interview, he observed that Ms. Luu, who was to be his direct supervisor, spoke very little and came across to him, as disinterested. Mr. Qureshi believed that Ms. Luu was not interested in him being hired, but she did not share her reluctance with Ms. Yordanov who did most of the talking during the interview.

46.      Mr. Qureshi felt that because he was not Indian or Vietnamese, there was no one to speak

for him, and that it did not help matters that he was male and not female.

47.      On Mr. Qureshi's last day, a young oriental female was interviewed for the accounting

position Mr. Qureshi was leaving.

48.      Mr. Qureshi was discriminated against, and terminated due to his race, sex/gender,

religion, and national origin. And that he was retaliated against, because he complained against

Ms. Luu's bulling, discrimination and hostility against him.

49.      On the first day, Ms. Luu started training Mr. Qureshi she informed him that she was

going on vacation. During the training, Ms. Luu told Mr. Qureshi that she will not train him on

Costpoint because Mr. Qureshi already knew how to use Costpoint. However, Ms. Luu did not

tell Mr. Qureshi that her accounts department was having problems with Costpoint.

50.      Mr. Qureshi would later find, when he started generating bills on his second day, that

there was problem with Costpoint. And late, Ms. Zornitsa Yordanov would send out email that

informed all accounting staff, that they have issues with Costpoint, and that it was causing delays

in sending out bills.

51.      Ms. Harllee insisted that Mr. Qureshi start work on August 2, instead of August 1,

because Ms. Luu was leaving for her vacation on August 2. They terminated him on August 29th

for no reason at all. Mr. Qureshi did all his billing and other assigned work well and accordingly.

52.     Mr. Qureshi feels that his termination was planned just before the first of September, so that CTI would not have to pay him any benefits such as health insurance, etc.

53.     Whenever Ms. Eleanor Luu, writes Mr. Qureshi, she also copied her supervisor Ms. Yordanov, and will end her every such email with the line, "If you have any questions, please ask."  However, when Mr. Qureshi asked her a question about project 1003.01 .00 (MACPRO), because it took him the whole day - eight (8) hours to revise an invoice that was close to two million dollars (about $2,000,000), she disingenuously snapped at hi, and reprimanded him to "stop asking questions and just do your work" which shocked Mr. Qureshi because he found it unbecoming for a supervisor to reprimand her subordinate for asking legitimate questions about the work he was doing, and especially as it was an invoice that was originally prepared by others before he was hired, that he was then task with the revision of putting it in PDF format instead of Excel, which he successfully did.

54.     Ms. Luu condescendingly asked Mr. Qureshi what a fixed price invoice was. He explained it to her, and she retorted and said, "It is not a fixed-price contract definition." Mr. Qureshi just kept quiet about it. Ms. Luu did not ask Mr. Qureshi what "a fixed-price contract definition" was, but what a "fixed price invoice" was. She knew that Mr. Qureshi knew the answer. However, her sole purpose was to belittle him as she was condescending to him. Ms. Luu had the opportunity to ask Mr. Qureshi what a fixed-price contract definition was, or any question for that matter during his interview, but did not do so.

55.     On an occasion, Ms. Luu sent Mr. Qureshi an e-mail, instructing him not to be copying Ms. Yordanov further on any email he sent to her. To which Mr. Qureshi responded that he will comply with her orders.

56.     Ms. Yordanov told the staff that going forward, she or the CFO will have one on one meeting with staff. There was never a group team meeting.

57.     Management did know what was going in the department, until Mr. Qureshi wrote his first memo and made management aware of the problems he was having in the department. For that, he got terminated instead, for pointing out problematic workplace issues that were of concern to him.

58.     Ms. Luu got angry and hostile with Mr. Qureshi, for pointed out the problems with Costpoint, which Ms. Luu already knew about the problems, but intentionally avoided informing Mr. Qureshi about it. Ms. Luu was never supportive of her new employee, Mr. Qureshi.

59.     On another occasion, Ms. Luu yelled at Mr. Qureshi not to fall asleep, when he was not falling asleep. Mr. Qureshi considered that to be intimidating, embarrassing, harassment and condescendingly hostile.

60.     A couple of weeks on the job, Mr. Qureshi wrote Ms. Yordanov and Ms. Laura, complaining about Ms. Luu and informing them that he did not appreciate some of the things that was happening in the accounting department, and that Eleanor Luu, her supervisor, was the source of it all.

61.     He complained that a Ms. Luu had a heated exchange with a coworker Kim about payroll. Ms. Luu and Kim started speaking in English but later switched to Vietnamese.

62.     A day later Ms. Luu questioned another coworker Hahn, about accounts payable. Ms. Luu wanted to know why accounts payable was not done. Hanh replied that it takes time to complete. Then Ms. Luu turned to Mr. Qureshi, shouted angrily at him and complaining that they were behind in billing.

63.     When Ms. Luu stepped out, Hanh tried to console Mr. Qureshi, by telling him that Eleanor "is like that when she gets pressured from her manager." But Mr. Qureshi did not appreciate Ms. Luu shouting at him in that manner for any reason. He did not want Ms. Luu to take her frustrations on him, or be her punching bag.

64.     Mr. Qureshi complained that he had only been at CTI for eleven days, at the time, has put in his best, had done his job by getting the bills done, and that he was not the cause of the account department being behind it billing. Mr. Qureshi also received an email from Ms. Yordanov that commented about her hearing of the good work Mr. Qureshi was doing.

65.     Mr. Qureshi complained that there were Costpoint issues that caused billing delays, and those issues were already in existence before he was hired, and so the billing delays had nothing to do with him.

66.     Mr. Qureshi also explained that the account department had three or five invoices rejection notices from CTI clients, which he did not generate or submit but was generated and

16

submitted by either Chaka or Eleanor Luu, before he was hired, that needed to be revised and re-submitted which takes time to do.

67.     Mr. Qureshi complained to Ms. Yordanov and Ms. Laura that he did not appreciate the fact that all three of his accounting coworkers were speaking in Vietnamese language most of the time, and that sometimes they were very loud. He complained that on one of the days, their constant and loud chatter was gave him headache.

68.     Mr. Qureshi complained that his Vietnamese coworkers were so loud that at times he felt like walking out of the office and saying it aloud to them to please stop it, but did not, because he respects his coworkers' language and culture, but believed they should also be courteous and respectful to him by speaking in English and quietly most of the time. And so, for a while, he endured it in silence until he could no longer, and so complained about it to Ms. Yordanov.

69.     Plaintiff complained that the department looked very unprofessional when his Vietnamese coworkers chatted loudly with each other in Vietnamese while working, and that it affected his concentration in his work.

70.     Mr. Qureshi's Vietnamese coworkers all speak English. So he wondered why they chose not to speak or discuss with each other in the office, in English but in Vietnamese, most of the time.

71.     Mr. Qureshi explained to Ms. Yordanov and Ms. Laura that when he gets a call from someone who does not speak English and the call may take more than two minutes, he usually

will step out of the office he shared with the rest of the accounting staff, to an unoccupied room or go out of the building, so that he does not distract or disturb his coworkers attention to their work.

72.     In his note to Ms. Yardanov and Ms. Laura, Mr. Qureshi told them that he has a sense that Ms. Luu was not on board with the decision to hire him. He stated that he noted during his interview, he asked the last following question: "Do you have concerns about me that I can address? And that the response he got, was no, from Ms. Luu and Ms. Yordanov who interviewed him. Mr. Qureshi also told them that he found it odd during his interview that Ms. Yordanov talked to him 85% of the time and Eleanor Luu, who would be his direct supervisor and boss, spoke to him 15% of the time.

73.     Mr. Qureshi pointed out that Ms. Luu needed to take full responsibility for what was happening in regard to the billing in the accounting department. And that he was not responsible for the billing delays, and could not have caused all billing issues in eleven days, buthat he was aware that he inherited a mess that he will have to fix, but that it will take time fix it.

74.     After Mr. Qureshi's complaint against Ms. Luu to Yardanov and Laura, and apparently after Ms. Yordanov had discussed his complaint with Ms. Luu, she retaliated against Mr. Qureshi with false and unfounded accusations against him, in a memo dated August 21, 2019.

75.     Ms. Eleanor Luu wrote Mr. Qureshi a memo and thereafter, asked Mr. Qureshi to follow her to the conference room, without telling him what she needed him there for. In the conference

room, Ms. Luu handed Mr. Qureshi her memo to him, and asked him to read it in front of her, and so, Mr. Qureshi read her memo to him, while sitting in front of, and directly facing Ms. Luu. Ms. Luu did not have any discussion whatsoever with Mr. Qureshi regarding the memo she handed him, and so, she and Mr. Qureshi left the conference room.

76.     Mr. Qureshi believes that Ms. Luu took him into the conference room in order to intimidate, harass, humiliate, and to provoke a negative reaction from him. He saw it as part of Ms. Luu's discriminatory, and harassing treatment of him that created a hostile environment for him to work in. He was highly offended by it and he found it to be intentional, unwarranted and unacceptable.

77.     Ms. Luu and Mr. Qureshi share same office space with Ms. Luu and the other accounts department employees. Ms. Luu sits right behind Mr. Quresi. However, she did not hand him the memo there or by email, when she could. She did not give him a date and time to discuss her memo, because what she wrote was retaliatory and all false, and there was no genuine reason for any discussion.

78.     Ms. Lue simply wanted space alone with Mr. Qureshi so that she could intimidate him by her sheer presence as his direct supervisor and one who has power over him. And her falsehoods in her memo was meant to intimidate and show him that she was the boss, and what she can do to him. Below are the contents of Ms. Luu's memo dated Wednesday, August 21, 2019 (two

days after Mr. Qureshi's August 19, 2019 memo to Ms. Yordanov and Laura, complaining about

Ms. Luu), that she handed Mr. Qureshi to read :

> "Tahir, since you joined the team some two or so weeks ago, I wanted to bring some items that I have observed to your attention.
> As your direct supervisor, I have noticed that you sometimes exhibit what I consider to be either rude and/or unprofessional behavior. For example:
> At times, you have visibly expressed anger and frustration when you have computer, system or other issues and you are short with me or your team mates and talk in a manner that is unbecoming. Ex. Communication between IT guys the other day! This also creates a hostile work environment for the team and is completely unacceptable. I would like to advise you that this is a professional environment and you need to control your anger and frustration to people that try to help you when you are having issues. We are a team and we need to find a way to destress when things sometimes get too much. Please also keep in mind that we are trying to help you when you ask for help so make sure you manage your frustration and anger. This means that you need to cooperate so you get the help you need and the issue can be resolved more quickly.
>
> I have observed that you disappear for long periods of time (1-2 hours) between 8am - 10am almost every day. As a matter of courtesy to myself and the team, going forward please ensure that you advise me if you are going to be away from your desk for any long period of time so that I know what to expect and am not spending time looking for you if I happen to need something.
>
> I have also observed that during meetings and even when you are at your workstation, you appear to be either dozing off or asleep. May I suggest that if you need a break, then by all means let me know and take one, however, dozing off at work during the day is not acceptable and is unprofessional. If there are any extenuating circumstances, like you are taking medications that make you drowsy, for example, that is causing you to doze off or sleep, then please let me know and we can speak to HR about it. However, if this is not the case, then please refrain from this behavior immediately."

79.    After meeting with Mr. Qureshi in the conference room without discussing the memo she

gave him to read, which he did, in her presence, Ms. Luu would later send Mr. Qureshi on the

same day, the following additional false and intimidating memo:

"Hi Tahir, Attached is a copy of what we discussed today.
Please don't forget to log off your computer when you step out of the F&A room.
Also, be careful with invoice tracker because I found that there are two contracts (5005 & 9001) is missing from the invoice tracker.

Please feel free to discuss if you have any additional questions.

Thanks. R/EP
Eleanor Luu"

80.     None of the accusations against Mr. Qureshi in Ms. Luu's two above quoted internal memos to Mr. Qureshi, is accurate or true. They are simply a concocted tit for tat retaliatory response from Ms. Luu against Mr. Qureshi, for complaining to Yordanov and Laura about her harassment, bullying, and unacceptable hostility towards him and her discriminatory treatment of him, based on his race, sex/gender, national origin and religion.

81.     Ms. Luu mendaciously wrote "…a copy of what we discussed today." But she never discussed her memo with Mr. Qureshi. She simply gave it to him to read, as a set up trap, so as to intimidate and watch Mr. Qureshi's reaction to her intimidation. Ms. Luu had hoped that Mr. Qureshi will react in a way that will fit her false narrative of him, that she will then use against him to justify the very false picture she had attempted to paint of Mr. Qureshi, in her memo.

82.     Ms. Luu's trick and trap failed in her face, because Mr. Qureshi was not the angry man she attempted to portray him as in her memo. And when he said nothing after reading her memo to him, she had nothing to say, but send another intimidating, false and baseless accusation or observation against Mr. Qureshi about the "two contracts (5005 & 9001) missing from the invoice tracker" that she could not have added to her other accusations in her earlier memo? And which she or anyone never complained to Mr. Qureshi or about, if it were true, until after his complaint memo against her, of August, 19, 2019.

83.     Mr. Qureshi believes that Ms. Luu's above quoted two memos dated Wednesday, August 21, 2019, were retaliatory because they were only prompted by Mr. Qureshi's e-mail complaint to Ms. Yordanov and Laura dated Monday, Aug 19, 2019.

84.     In his memorandum dated August 19, 2019, Mr. Qureshi, complained to Ms. Zornitsa Yordanov, CTI's Controller, and Ms. Luu's supervisor, about Elearnor Luu's hostility, bullying, and shouting that she directed at him without good reason, and the intimidating and humiliating way she treated him.

85.     Mr. Qureshi complained about his other two female coworkers who were very unprofessional, and disrupted his focus when they always talked in loud voices in Vietnamese. He complained that even though all CTI's clients and employees spoke English, for some reason, his Vietnamese coworkers decided to speak Vietnamese all the time. It appeared to Mr. Qureshi that his complaint against Eleanor for her hostile treatment of him, and his request that other two Vietnamese female coworkers speak in English, did not endear him to Ms. Luu.

86.     Mr. Qureshi started work at CTI on August 2, 2019. On August 19, 2019, he wrote Ms. Zornista Yardanov, and Ms. Laura, complaining of harassment, and hostile treatment by Ms. Luu, and raising other matters that was affecting his work. Two days later, after that complaint memo, and eighteen (18) days after Mr. Qureshi started working at CTI, on August 21, 2019, Ms. Luu wrote to Mr. Qureshi and among other things, accused him of creating a hostile work environment at CTI. Ms. Luu's actions and false accusations amount to harassment, hostility and are retaliatory.

87.     Prior to Mr. Qureshi's complaint, Ms. Luu never complained to Mr. Qureshi privately or otherwise, about the false accusations and trumped up observations she claimed she made in her email memos to Mr. Qureshi. Ms. Luu had the power and opportunity to make her observations

22

known to Mr. Qureshi, and could have brought them to Mr. Qureshi's attention, if they were true, and of concern to her, prior to his email memo to Zornitsa and Laura, but never did so until after he complained about her wrongful conducts.

88.     Ms. Luu's alleged observations or accusations are mere false statements that she knows to be false. Yet, she intentionally, recklessly and discriminatorily made them without regard to Mr. Qureshi's rights.

89.     There was printer issues before Mr. Qureshi started work at CTI. However, seeing that it was taking long for the printer to be fixed, he made a forceful and firm request to IT people that the printer in the accounting department be fixed without further delay, because it was impacting negatively on the accounts department's work.

90.     Before Mr. Qureshi was hired, the existing printer in CTI's accounting department was already malfunctioning, and his supervisors and all the other accounting staff, were aware of this fact, as they all experienced the continuous paper jams, which caused delay in completing certain accounting work that needed printing or copying, and frustrated accounting staff.

91.     Mr. Qureshi was faced with the difficulty of having to work with a broken and constantly malfunctioning printer. He found himself having to clear paper jams continuously, from an old and worn out printer, that needed repair or replacement but had nothing being done.

92.     Realizing how their accounting work had been impacted by the non-functioning printer, he took the initiative and the time to send printer malfunctioned tickets twice or thrice to IT people, and discussed the matter with them, because he wanted them to solve the printer problem and make things better for all at the accounting department.

93.     Mr. Qureshi was not alone in expressing the need for an immediate repair of the broken printer in the accounts department. Another coworker Kim expressed similar frustration about

the printer. The controller Ms. Yardanov also expressed similar frustration when once she walked into the accounting staff's cubicles areas and said loudly to everyone's hearing that "I cannot do my work if I cannot print." Both Kim and Zornista were expressing frustration about the same issue that Mr. Qureshi was discussing with the IT people – need for a well-functioning printer.

94.     Ms. Luu falsely accused Mr. Qureshi of creating a hostile work environment at CTI. However, she was in fact, the one who caused and created a hostile work environment for Mr. Qureshi, by her discriminatory actions harassment and hostile treatment against him.

95.     Mr. Qureshi's accounting colleagues, Kim and Zornista openly complained about the same printer, and how it was impacting their work, but no one, including Ms. Luu, accused them of creating a hostile work environment because of their comments about the printer, but Mr. Qureshi was. This clearly amounts to a double standard disparate treatment.

96.     Mr. Qureshi discussed with Mr. Avery, and during his discussion with Mr. Avery, Mr. Qureshi suggested to him about having a second printer. Mr. Qureshi told Mr. Avery that he needs to look into it after their move to the lower suite.

97.     After Mr. Qureshi's firm request and discussion with the IT department, nudging them and suggesting to them how they can deal with the broken printer issue, the IT department got the accounting department a new printer.

98.     However, instead of commending Mr. Qureshi for taking the initiative to make the case for immediate action regarding the printer, and for successfully getting the desired result - a new and functioning printer (which no one in the accounting department was able to successfully make a case for before he was hired), Ms. Luu unscrupulously and unconscionably distorted the facts, for discriminatory and retaliatory purposes against him.

99.     To Mr. Qureshi's knowledge, no one from the IT department complained directly to him about his approach to the IT people regarding the printer matter. None of his superiors informed him of any IT complaint against him. And Ms. Luu, herself, never claimed or told Mr. Qureshi that anyone from IT ever complained against him, prior to his 8/19/2019 complaint against her.

100.    In her memo email to Mr. Qureshi, dated August 21, 2019, Ms. Luu wrongly and falsely accused Mr. Qureshi of disappearing "for long periods of time (1-2 hours) between 8am - 10am almost every day" even though she knew this to be completely false.

101.    During Mr. Qureshi's tenure at CTI, whenever he was taking a half hour lunch break, he would let Ms. Luu, Kim or Hanh know before he leaves. Most of the time within the eighteen (18) days from his start date August, 2, 2019 to August 21, 2019, when Ms. Luu falsely accused Mr. Qureshi of  having "(1-2 hours)… every day," Mr. Qureshi had been having most if not all his lunch at his desk. Ms. Hahn was aware of this fact, because she saw Mr. Qureshi eating his lunch at his desk, which prompted her to comment that Mr. Qureshi eats a very light lunch.

102.    Mr. Qureshi believes that Ms. Luu did not want to work with a male subordinate, and obviously did not know how to deal with him - a man, who have just been hired to work under her supervision.

103.    Mr. Qureshi found Ms. Luu as unenthusiastic during his whole interview, and he believes that Ms. Luu was not happy that he was hired, as she clearly was not on board with that decision. After he was hired, it became her intent to do anything she could, to push him out of his employment with CTI, and that was her only reason for her unfounded and false retaliatory accusations against him.

104.    Ms. Luu treated Mr. Qureshi in a discriminatory manner, because she singled him out, but other coworkers who worked under her supervision, were not treated the same way as Mr.

Qureshi was treated. And they were not retaliated against, because they were all female and Ms. Luu respected them and talked to them in their Vietnamese language, while Mr. Qureshi a Pakistani-American Muslim male, was.

105.    At CTI, in order for Mr. Qureshi to be paid, he must submit his time sheet for approval to her supervisor Ms. Luu. No CTI employee was paid unless their time sheets were approved by their supervisor. Mr. Qureshi submitted his time sheets throughout his short-lived tenure at CTI to his supervisor, Ms. Luu, approved all of them, and he was accordingly paid for all of them, including for the preceding eighteen (18) days from August 2, 2019 to August 21, 2019 - the date of Ms. Luu's email memo to Mr. Qureshi where she implicitly though falsely, accused Mr. Qureshi of stealing time from his employer, which he never did.

106.    As part of her harassment and hostility towards Mr. Qureshi, Ms. Luu also made sweeping generalizations and falsely accusing him of dosing at his desk and at meetings, stating that she "observed that during meetings and even when you are at your workstation, you appear to be either dozing off or asleep."

107.    Ms. Luu's apparent accusation of Mr. Qureshi of dozing off or sleeping at meetings and at his desk, was one other pretext and cover up attack against Mr. Qureshi, intended to cover up her harassment and hostility against Mr. Qureshi, which he did not appreciate.

108.    Mr. Qureshi is always quiet when he was working. Also, due to the way Mr. Qureshi's desk was situated, with his back to Ms. Luu's, Ms. Luu cannot tell when he was reading something, instead she recklessly assumed he may have been dozing off or sleeping while he was not. Because of that, Ms. Luu would shout at him, "Tahir, are you asleep?" Mr. Qureshi did not find her shouted such question funny or necessary, while he was busy trying to do his job. Mr. Qureshi saw that as a form of harassment from Ms. Luu against him.

109.    Though according to Ms. Luu herself, she did not know or was not sure that Mr. Qureshi was dozing off or asleep ("I have also observed that…you appear to be either dozing off or asleep.") Yet, she put it out there in her memo to Mr. Qureshi, as a retaliatory tool, because she wanted to intimidate, humiliate, discredit and put Mr. Qureshi's professional character in a bad light in order to support her discriminatory animus and intention to fire him.

110.    Ms. Luu also added to her intentional harassment and hostility towards Mr. Qureshi, a more sinister narrative and innuendo with no basis, by inserting statement that suggests that Mr. Qureshi had some health issues that made him "appear to be either dozing off or asleep" during meetings and at his desk.

111.    Ms. Luu made her observations known to Mr. Qureshi and other interested parties on August 21, 2019, after Mr. Qureshi complained to Ms. Luu's supervisor Zornister and Laura on August 19, 2019, about the unacceptable hostile and discriminatory manner Ms. Luu treated him, and how he was targeted by Ms. Luu because he was male, a Pakistani, and a Muslim.

112.    At the time of Ms. Luu's statement about observing Mr. Qureshi appearing "to be either dozing off or asleep" in meetings and at his desk, Mr. Qureshi had worked for a total of eighteen (18) days and Ms. Luu never brought that to his attention, but only, after he accused her of bullying her and creating a hostile work environment in the accounting department.

113.    Ms. Luu's false accusations and invidious discriminatory innuendos against Mr. Qureshi, were intentionally retaliatory. And that is the reason Ms. Luu made a malice-induced false, sweeping and generalized accusations against Mr. Qureshi, because they are not true and she cannot substantiate them.

114.    Ms. Luu did not mention the number of times and dates, or when, i.e. at what meetings when Mr. Qureshi was dozing off or sleeping rather that she observed that he "appear to be either

dozing off or asleep." Ms. Luu's false accusatory memo to Mr. Qureshi was mean-spirited, vindictive and retaliatory.

115.   Ms. Luu's management style was hostile, intimidating, condescending and demeaning. She micromanaged with, threats, intimidation, and false accusations, and she muzzled anyone who attempts to call her out on her unlawful behavior.

116.   Mr. Qureshi did not appreciate being micromanaged, intimidated and harassed at work, so he complained about it, and thus making it clear to Ms. Luu that he will not be muzzled, and as a result he was terminated.

117.   Ms. Luu does not foster teamwork and collegiality even though she talked about it in her memo. In the span of about two weeks, Mr. Qureshi, a new employee, saw Ms. Luu argue with Kim about payroll. He saw her create tension with Hahn about accounts payable, and personally found himself on the receiving end of her intimidation bullying, disrespectful and unprofessional manner of dealing, and false allegations against him, without a shred of evidence.

118.   Watching the series of unprofessional and unacceptable conducts that Ms. Luu engaged in during the span of about two weeks with people who reported to her, it was clear to Mr. Qureshi, that Ms. Luu does not foster trust or teamwork. It is also clear that Ms. Luu, a supervisor who makes false accusations against her subordinates, does not solve problems, rather creates them.

119.   Ms. Luu called Mr. Qureshi "honey" and "dude." Mr. Qureshi did not like being address in that manner and asked that Ms. Luu stop calling him honey or dude. Mr. Qureshi felt that it was unprofessional for Ms. Luu's to be addressing him or any employee for that matter, at work, as honey or dude.

120.    The malicious treatment and experiences Mr. Qureshi suffered during his brief tenure at

CTI, at the hands of her former supervisor Ms. Luu, made it clear to him soon after he started

work at CTI, that she did not want him to succeed in his employment with CTI, and given also,

that all indications, it is also clear to Mr. Qureshi, that Ms. Luu, was not pleased with his hiring.

### COUNT I
### RACE. SEX/GENDER, NATIONAL ORIGIN, AND RELIGION
### INTENTIONAL DISCRIMINATION IN VIOLATION OF TITLE VII

121.    Plaintiff Mr. Qureshi hereby alleges and incorporates the preceding paragraphs.

122.    Plaintiff Mr. Qureshi is a person/individual within the meaning of Title VII. He is an

Asian- Pakistani-American male, and a Muslim.

123.    Defendant CollabraLink Inc., is an employer who engages in industry affecting

commerce - within the meaning of Title VII.

124.    Title VII prohibits discrimination on the basis of race, sex, gender, national origin and

religion. Title VII, 42 U. S.C. 2000e-2(a)(1).

125.    CTI discriminated against Mr. Qureshi and injured him, on the basis of his race,

sex/gender, religion, and national origin in violation of Title VII, 42 U. S.C. 2000e-2(a)(1), by

denying the him equal terms and conditions of employment and, or by terminating him.

126.    As a direct and proximate result of CTI's discrimination and resulting injury, Mr. Qureshi

has suffered and is still suffering considerable injury, including but not limited to loss of

substantial past and future salary and income, health insurance benefits and other privileges and

entitlements of employment, loss of professional status and career enhancing and advancement

opportunities and loss of retirement savings and benefits. Mr. Qureshi has also suffered from

emotional distress, anxiety and sleep deprivation/insomnia, arising from the loss of his job, the

damage to his professional reputation and the embarrassment, humiliation, and indignity arising

from the discriminatory conduct of Defendant and its management, or agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial hardship. The anxiety and sleep deprivation Mr. Qureshi suffered as a result, caused him to be put on medication by his doctor. For these, CTI is liable to Mr. Qureshi in damages.

127.    As a consequence of CTI's action against Mr. Qureshi, CTI is additionally liable for Mr. Qureshi's attorney's fees, costs and interest incurred in pursuing this litigation.

### COUNT II
### HARASSMENT AND HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF TITLE VII

128.    Plaintiff hereby alleges and incorporates the preceding paragraphs.

Defendant CTI, through the actions of Ms. Luu its agent, supervisor, and management employee, created a hostile work environment and/or harassed Mr. Qureshi because of his race, sex/gender, religion and national origin. Ms. Luu's offending conduct was unwelcome, and unacceptable to Mr. Qureshi. Ms. Luu's conduct was based on Mr. Qureshi's race, sex/gender, religion and national origin. Ms. Luu's conduct was sufficiently severe or pervasive because it altered Mr. Qureshi's conditions of her employment, and created an abusive work environment that was imputable to CTI, as his employer, because Ms. Luu was CTI's agent, acting on its behalf, and CTI knew about Ms. Luu's unlawful conduct, because Mr. Qureshi complaint about Ms. Luu's conduct to it, but it did nothing to address the problem, instead, it terminated Mr. Qureshi.

129.    Mr. Qureshi suffered tangible employment action. He was retaliatorily written up by Ms. Luu, and was ultimately terminated, based on his race.

130.    Mr. Qureshi suffered tangible employment actions from his supervisor Ms. Luu, when she discriminated against him on the basis of his race, sex/gender, religion and national origin. in violation of 42 U.S.C. § 2000e-2(a)(1); When Ms. Luu who is CTI's accounting manager,

harassed, intimidated, yelled at him, bullied him, and treated him with such hostility that she never used in the way she treated his female coworkers, who are all Vietnamese-Americans as Ms. Luu herself, which culminated in him being terminated.

131.     As a direct and proximate result of CTI's discriminatory, hostile work environment and harassment, and resulting injury, Mr. Qureshi has suffered and is still suffering considerable injury, including but not limited to loss of substantial past and future salary and income, health insurance benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. Mr. Qureshi has also suffered from emotional distress, anxiety and sleep deprivation/insomnia, arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of CTI and or its management, or agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial hardship. The anxiety and sleep deprivation Mr. Qureshi suffered as a result, caused him to be put on medication by his doctor. For these, CTI is liable to Mr. Qureshi in damages.

132.     As a consequence of CTI's action against Mr. Qureshi, CTI is additionally liable for Mr. Qureshi's attorney's fees, costs and interest incurred in pursuing this litigation.

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII

133.     Plaintiff hereby alleges and incorporates the preceding paragraphs.

Title VII, prohibits, (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees… because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a)

134.    Mr. Qureshi engaged in protected activity and opposition to practices made unlawful under Title VII while employed by CTI, when, in his memorandum email to Zornista Yordanov and Laura, dated August 19, 2019, he opposed Ms. Luu's discrimination, harassment, and hostile treatment of him, that made it very difficult and stressful for him to do his work.

135.    A casual connection exists between Mr. Qureshi's protected activity and the adverse employment actions taken by CTI against Mr. Qureshi, including but not limited to his termination.

136.    As a result of his protected activity, and opposition to practices made unlawful under Title VII Plaintiff was subjected to an adverse employment action, up to and including termination.

137.    As a direct and proximate result of CTI's retaliation, and resulting injury, Mr. Qureshi has suffered and is still suffering considerable injury, including but not limited to loss of substantial past and future salary and income, health insurance benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. Mr. Qureshi has also suffered from emotional distress, anxiety and sleep deprivation/insomnia, arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of CTI and or its management, or agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial hardship. The anxiety and sleep deprivation Mr. Qureshi suffered as a result, caused him to be put on medication by his doctor. For these, CTI is liable to Mr. Qureshi in damages.

138.    As a consequence of CTI's action against Mr. Qureshi, CTI is additionally liable for Mr.

Qureshi's attorney's fees, costs and interest incurred in pursuing this litigation.

## COUNT IV
## INTENTIONAL DISCRIMINATION IN VIOLATION OF § 1981

139.    Plaintiff hereby alleges and incorporates the preceding paragraphs.

Defendant CTI intentionally discriminated against Mr. Qureshi, based on his race, because he is

Asian Pakistani, in violation of 42 U.S.C. § 1981 by denying him equal terms and conditions of

employment and or by terminating him. But-for Ms. Luu's racial animus against Mr. Qureshi, he

would not have been discriminatorily terminated.

140.    The discriminatory treatment Mr. Qureshi experienced at CTI, was not experienced by

his other non- Asian Pakistani coworkers who were all Vietnamese, and also employees of CTI.

141.    CTI and its management, intentionally interfered with Mr. Qureshi's contract of

employment because of their discriminatory animus towards his race. CTI and its management

acted in a willful, reckless and wanton manner and in callous disregard for the federally-

protected rights of Mr. Qureshi.

142.    As a direct and proximate result of CTI's discrimination and resulting injury, Mr. Qureshi

has suffered and is still suffering considerable injury, including but not limited to loss of

substantial past and future salary and income, health insurance benefits and other privileges and

entitlements of employment, loss of professional status and career enhancing and advancement

opportunities and loss of retirement savings and benefits. Mr. Qureshi has also suffered from

emotional distress, anxiety and sleep deprivation/insomnia, arising from the loss of his job, the

damage to his professional reputation and the embarrassment, humiliation, and indignity arising

from the discriminatory conduct of Defendant and its management, or agents or employees

acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant

financial hardship. The anxiety and sleep deprivation Mr. Qureshi suffered as a result, caused him to be put on medication by his doctor. For these, CTI is liable to Mr. Qureshi in damages.

143.    As a consequence of CTI's action against Mr. Qureshi, CTI is additionally liable for Mr. Qureshi's attorney's fees, costs and interest incurred in pursuing this litigation.

<u>**COUNT V**</u>
<u>**HARASSMENT HOSTILE WORK ENVIRONMENT**</u>
<u>**IN VIOLATION OF § 1981**</u>

144.    Plaintiff hereby alleges and incorporates the preceding paragraphs.

145.    Defendant CTI, through the actions of Ms. Luu its agent, supervisor, and management employee, created a hostile work environment and/or harassed Mr. Qureshi because of his race. Ms. Luu's offending conduct was unwelcome, and unacceptable to Mr. Qureshi. Ms. Luu's conduct was based on Mr. Qureshi's race. Ms. Luu's conduct was sufficiently severe or pervasive because it altered Mr. Qureshi's conditions of her employment, and created an abusive work environment that was imputable to CTI, as his employer, because Ms. Luu was CTI's agent, acting on its behalf, and CTI knew about Ms. Luu's unlawful conduct, because Mr. Qureshi complaint about Ms. Luu's conduct to it, but it did nothing to address the problem, instead, it terminated Mr. Qureshi.

146.    Mr. Qureshi suffered tangible employment action. He was retaliatorily written up by Ms. Luu, and was ultimately terminated because of his race.

147.    Mr. Qureshi suffered tangible employment actions from his supervisor Ms. Luu, when she discriminated against him on the basis of his race. in violation of 42 U.S.C. § 1981, when Ms. Luu who is CTI's accounting manager, harassed, intimidated, yelled at him, bullied him, and treated him with such hostility that she never used in the way she treated his female coworkers, who are all Vietnamese-Americans as Ms. Luu herself, that culminated in him being terminated.

148.    As a direct and proximate result of CTI's discriminatory, harassment and the hostile work environment Ms. Luu created for Mr. Qureshi to work in, and resulting injury, Mr. Qureshi has suffered and is still suffering considerable injury, including but not limited to loss of substantial past and future salary and income, health insurance benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. Mr. Qureshi has also suffered from emotional distress, anxiety and sleep deprivation/insomnia, arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of CTI and or its management, or agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial hardship. The anxiety and sleep deprivation Mr. Qureshi suffered as a result, caused him to be put on medication by his doctor. For these, CTI is liable to Mr. Qureshi in damages.

149.    As a consequence of CTI's action against Mr. Qureshi, CTI is additionally liable for Mr. Qureshi's attorney's fees, costs and interest incurred in pursuing this litigation.

## COUNT VI
## RETALIATION IN VIOLATION OF § 1981

150.    Plaintiff hereby alleges and incorporates the preceding paragraphs.

Mr. Qureshi engaged in protected activity and opposition to practices made unlawful under 42 U.S.C. § 1981 while employed by CTI, when, in his memorandum email to Zornista Yordanov and Laura, dated August 19, 2019, he opposed Ms. Luu's discrimination, harassment, and hostile treatment of him, that made it very difficult and stressful for him to do his work.

151.    A casual connection exists between Mr. Qureshi's protected activity and the adverse employment actions taken by CTI against Mr. Qureshi, including but not limited to his termination.

152.     As a result of her protected activity and opposition to practices made unlawful made

unlawful under 42 U.S.C. § 1981, Mr. Qureshi was subjected to an adverse employment action,

up to and including termination.

153.     As a direct and proximate result of CTI's retaliation, and resulting injury, Mr. Qureshi

has suffered and is still suffering considerable injury, including but not limited to loss of

substantial past and future salary and income, health insurance benefits and other privileges and

entitlements of employment, loss of professional status and career enhancing and advancement

opportunities and loss of retirement savings and benefits. Mr. Qureshi has also suffered from

emotional distress, anxiety and sleep deprivation/insomnia, arising from the loss of his job, the

damage to his professional reputation and the embarrassment, humiliation, and indignity arising

from the discriminatory conduct of CTI and or its management, or agents or employees acting on

its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial

hardship. The anxiety and sleep deprivation Mr. Qureshi suffered as a result, caused him to be

put on medication by his doctor. For these, CTI is liable to Mr. Qureshi in damages.

154.     As a consequence of CTI's action against Mr. Qureshi, CTI is additionally liable for Mr.

Qureshi's attorney's fees, costs and interest incurred in pursuing this litigation.

### **RELIEF SOUGHT BY PLAINTIFF**

WHEREFORE, the Plaintiff Mr. Qureshi respectfully requests this Court award economic
damages to be proved at trial, and in addition:

A. Enter judgment for the Plaintiff Mr. Qureshi against Defendant CTI on all Counts, in an
amount no less than $1,000,000.00 (One Million Dollars)

B. Declare that the conduct of Defendant CTI is in violation of Title VII and Section 1981.

C. Award Mr. Qureshi reinstatement, punitive damages, full back pay and front pay, including
salary, benefits, entitlements, loss of professional status and career enhancing opportunities,
bonuses, cash awards, loss of retirement savings and benefits and other remuneration and

privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case.

D. Award Mr. Qureshi compensatory damages for emotional distress injuries and loss;

E. Award Mr. Qureshi pecuniary and out of pocket expenses;

F. Order Defendant CTI to pay all reasonable attorney's fees, court costs, and expenses incurred by Plaintiff  Mr. Qureshi as a result of CTI's actions and inactions, and also, pre judgment and post-judgment interest;

G. Grant Injunctive Relief by barring CTI and its employees, management, agents, and representatives from engaging in any unlawful discriminatory employment policies or practices against its present and future employees;  and

H. Grant such other legal and equitable relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issuers triable by a jury in this action.

Respectfully submitted this 3rd day of December, 2020.

/s/_____
Stephen Christopher Swift (Va. Bar No. 38419)
Swift & Swift, Attorneys at Law, P.L.L.C.
Suite 200
2121 Eisenhower Avenue
Alexandria, Virginia 22314-4688
Telephone: (703) 418 – 0000
Facsimile: (703) 535 – 8205
E-mail: steve@swift.law.pro

*Attorney for Plaintiff Tahir Qureshi*